# UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## JACKSONVILLE DIVISION

JACOB AARON LEVEILLE,

      Plaintiff,

v.                             Case No.: 3:19-cv-908-BJD-MCR

RYAN EDWARD UPCHURCH,
professionally known as Upchurch,

      Defendant.

_____/

## <u>ORDER</u>

**THIS CAUSE** is before the Court upon Plaintiff Jacob Aaron LeVeille's

Motion for Summary Judgment of Defendant Ryan Edward Upchurch PKA

Upchurch's Consolidated Counterclaim (Doc. 84; Plaintiff's Motion) and

Defendant's Opposition (Doc. 91); and Defendant's Amended Motion for

Summary Judgment of Plaintiff's Consolidated Complaint (Doc. 89;

Defendant's Motion) and Plaintiff's Opposition (Doc. 90).[1]

## I.    Background

At issue in this action are two works of visual art (the "works") Plaintiff

created. Plaintiff alleges Defendant intentionally mutilated and distributed

the works without permission. One is a portrait of Johnny Cash (Cash

---

[1] For purposes of clarity and consistency, throughout this order the Court refers to
Jacob Aaron LeVeille as Plaintiff, and Ryan Edward Upchurch as Defendant.

Portrait) and the other is a portrait of Defendant (Upchurch Portrait). (Doc.

49). Plaintiff brings this action pursuant to the Visual Artists Rights Act of

1990 (VARA), 17 U.S.C. § 106A, and the Copyright Act, 17 U.S.C. § 106, in

his Consolidated Complaint for the alleged Intentional Violation of a Visual

Artist's Right of Integrity under VARA (Count One); Conversion (Count Two);

Trespass to Chattels (Count Three); and Copyright Infringement (Count

Four). Id. at 13-16. Defendant brings a counterclaim against Plaintiff for

defamation. (Doc. 35 at 7-12).

## II.   Discussion

### A.   Standards

Summary judgment shall be granted when "the movant shows that

there is no genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law."  Fed. R. Civ. P. 56(c); see Celotex Corp. v.

Catrett, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if

there is sufficient evidence "that a reasonable jury could return a verdict for

the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248

(1986). The party seeking summary judgment has the burden to demonstrate

no dispute exists as to any material fact in the case. Branche v. Airtran

Airways, Inc., 342 F.3d 1248, 1252-53 (11th Cir. 2003)  All evidence and

inferences from the underlying facts must be viewed in the light most

favorable to the nonmovant. <u>Earley v. Champion Int'l Corp.</u>, 907 F.2d 1077, 1080 (11th Cir. 1990).

A prima facie copyright infringement claim is established when a plaintiff shows: (1) ownership of a valid copyright in the allegedly infringed work; and (2) that defendant has copied protected elements of the allegedly infringed work. <u>See</u> <u>Cambridge Univ. Press v. Patton</u>, 769 F.3d 1232, 1249 (11th Cir. 2014).

**B.    Summary Judgment Motions**

**1.    Defendant's Motion**

<u>a.    Copyright Infringement Claims</u>

Defendant argues that summary judgment is appropriate in his favor as to Plaintiff's copyright infringement claim based on a fair use defense in that his use of the Upchurch and Cash portraits is transformative and intended as commentary and criticism of the parties' dispute. (Doc. 89 at 10-18). In response, Plaintiff asserts that material facts as to whether Defendant's use of his paintings amounts to fair use are disputed so that summary judgment is inappropriate. (Doc. 90 at 13-18).

At the heart of copyright law is the purpose "to promote the creation of new works for the public good by providing . . . creators an economic incentive to create." <u>See</u> <u>Cambridge Univ. Press</u>, 769 F.3d 1232, 1237 (11th Cir. 2014) (citation omitted).  This economic incentive to create must be balanced with

preventing overbroad restrictions on the unpaid use of copyrighted works

that could hinder the very protections meant to foster creativity. Id. at 1238.

Fair use is a defense to what would otherwise be infringing use of

copyright material. Id.  A defendant claiming fair use as a defense carries the

burden to persuade the court that the unpaid use of the copyrighted work is

equitable and aligned with the purpose of the Copyright Act. Id. at 1238,

1259.  A determination of fair use is made on a case-by-case basis, made after

weighing the facts of the case with the following:

> (1) the purpose and character of the use, including
> whether such use is of a commercial nature or is for
> nonprofit educational purposes; (2) the nature of the
> copyrighted work; (3) the amount and substantiality of
> the portion used in relation to the copyrighted work as
> a whole; and (4) the effect of the use upon the potential
> market for or value of the copyrighted work.

See 17 U.S.C. § 107; Cambridge Univ. Press, 769 F.3d at 1238. In weighing

these factors in light of the copyright act's purpose, "a given factor may be

more or less important in determining whether a particular use should be

considered fair under the specific circumstances of the case." Cambridge

Univ. Press, 769 F.3d at 1260; see Harper & Row Publishers, Inc. v. Nation

Enters., 471 U.S. 539, 560 (1985) ("Fair use is a mixed question of law and

fact."). When use of a copyrighted work is for purposes including "criticism,

comment, news reporting, teaching (including multiple copies for classroom

use), scholarship, or research," then it is not copyright infringement. <u>See</u> 17 U.S.C. § 107.

    1.    Purpose and Character of use

For the first factor, the court considers "(1) the extent to which the use is a 'transformative' rather than merely superseding use of the original work and (2) whether the use if for a nonprofit educational purpose, as opposed to a commercial purpose." <u>Cambridge</u>, 769 F.3d at 1261 (citation omitted). Use is transformative where the new work "adds something new, with a further purpose or different character, altering the first with new expression, meaning, or message." <u>Id.</u> at 1262 (citing <u>Campbell v. Acuff-Rose Music, Inc.</u>, 510 U.S. 569, 579 (1994)). In contrast, use of a work is not transformative where it "serves the same overall function as the original work." <u>Id.</u> (internal quotation marks omitted).

Another creative concept that falls within fair use under § 107 is parody. <u>See</u> <u>Campbell</u>, 510 U.S. at 579. Parody essentially transforms a work by using elements of the work for the purpose of comment or criticism that "reflects transformative value because it can provide social benefit, by shedding light on an earlier work, and, in the process, creating a new one." <u>Cambridge</u>, 769 F.3d at 1262 (quoting <u>Suntrust Bank v. Houghton Mifflin Co.</u>, 268 F.3d 1257, 1271 (11th Cir. 2001)) (internal quotation marks omitted). The "more transformative the new work, the less will be the

significance of other factors, like commercialism, that may weigh against a finding of fair use." Campbell, 510 U.S. at 579 (citation omitted). "The threshold question when fair use is raised in defense of parody is whether a parodic character may be reasonably perceived." Id. at 582 ("Its art lies in the tension between a known original and its parodic twin."). The "role of the courts is to distinguish between [b]iting criticism [that merely] suppresses demand [and] copyright infringement[, which] usurps it." Id. at 592 (internal quotation marks and citation omitted).

Foremost, Defendant has submitted copies of Plaintiff's copyright registration of the portraits supportive of Plaintiff owning copyright in the works. (Docs. 89-11, 89-12).  As presented on the document copies with Defendant's summary judgment motion, the copyright registration for the Upchurch portrait attributes Plaintiff as the copyright claimant and author and is dated January 27, 2020. The certificate of registration for the Johnny Cash portrait has this same effective date. (Docs. 89-11, 89-12).

Defendant maintains that his shooting of the portraits and use of the works on his social media was with the intent to create his own original work that would comment, criticize, and satirize the public dispute regarding Defendant's alleged commission of and failure to pay for the portraits. (Doc. 89-18). More specifically, Defendant testified that his process in shooting the portraits was based on his infatuation with an ammunition artist, Yelawolf,

- 6 -

and that he wanted to make "ammunition art like Yelawolf did which is why I shot [the] paintings in the middle" to "make them look cooler to [his] personal preference." Id. at 83-85. Defendant further stated that he made the video of the shooting of the paintings as a jab at Plaintiff but also to "help him with his career so he could sell more paintings." Id.  Defendant then signed and dated one of the paintings that he referred to as his "artwork" and a "piece of history, YouTube history." Id. at 90. A plan was made to give the paintings to The Real World Cheatham Co. and auction them with the proceeds going to pay for meals for underprivileged schoolchildren, according to Defendant. Id. at 91-92.

Defendant further testified about a social media post in which Cheatham County After Dark identified the painting of Defendant as being available for auction at its Second Annual Cursing for Kids live show. Id. at 93. The auction house described the painting as "one of a kind piece of music memorabilia, a painting of, autographed by and shot to hell by Ryan Upchurch." Id. Defendant acknowledged that according to this description the painting was a painting of him, signed by him and shot by him that was to be auctioned. Id. at 94.  The record further reflects a Facebook post by Cheatham that congratulates an individual on her win of the painting signed and shot by Defendant. Id. at 95. Defendant, however, testified that Plaintiff was harassing the auction house and Defendant got the paintings back from

the auction house and that he would deal with it and donate the money himself, that the woman who won the paintings returned them and Defendant that the paintings are at his house. Id. 94-96.

One of the paintings Cheatham posted on its Facebook account shows the phrase "fuck this dude's painting" has been written on it. Id. at 96. A copy of a photograph of the Cash work shows a signature under a date and below that the phrase "yeah I shot this shit" written on it with a different signature below these words. (Doc. 90-2). Defendant, however, testified that he did not recall writing those words on the painting. (Doc. 89-18 at 96-97). As for revenue from his social media posts, Defendant testified that he did not make any money from advertising or YouTube involving the painting. Id. at 100.

According to Plaintiff, Defendant's use of his portraits was for commercial purposes and not transformative and to promote himself and the intent to destroy Plaintiff's name, reputation, and art. (Docs. 89-19 at 5, 71-127; 90 at 14). As an example, Plaintiff stated that Defendant helped Plaintiff get into the country music industry, but after Defendant's public statements or story about Plaintiff, "almost all the country musicians in the country music industry look at [him] like a joke now." (Doc. 89-19 at 139).  In addition, Plaintiff submits that Defendant exploited his works to advertise and promote his name and professional status and manufactured a controversy on social media to profit from the attention. (Docs. 89-19 at 71-

127; 90 at 14). Plaintiff further took the video coupled with comments from Defendant's followers on his social media account as death threats for which he attributed the loss of his tattoo apprenticeship. (Doc. 89-19 at 119-22).

In addition, Plaintiff testified that Defendant placed Defendant's signature on his Johnny Cash painting and wrote "fuck this dude's painting" on it. Id. at 131-32. Plaintiff stated that he sent Defendant requests for money and to take the video with his painting in it down from social media (YouTube), but that Defendant responded, "are you kidding me. I don't got to take down my videos with my paintings in it." Id. Plaintiff testified that when he saw Defendant's post that Defendant was going to auction the paintings to the Cheatham County After Dark despite their discussions the week prior that the paintings were not a gift, Plaintiff decided to bring suit against Defendant. Id.

Plaintiff testified that Defendant helped him branch into the country music industry and that Plaintiff "got the fame for it" until the video of the shooting of the paintings. Id. at 133-34. Since the video posting, Plaintiff testified that he has sold two paintings (compared to his career as an artist since 2017 of ten paintings, some of which were exchanged for services and not money), has had under ten paid engagements for his art in the form of murals, albums, and digital art (one prior to 2017). Id. at 134-37. In all since the video, Plaintiff testified he has done more in terms of his art career. Id.

As an example, since Defendant posted the video of shooting Plaintiff's works, Plaintiff has had individuals commission him for paintings of which two have decided not to move forward with purchasing Plaintiff's work and one is in the process of buying a painting. Id. at 148-51. Plaintiff testified that he "completely lost the musician clientele, music producer clientele, anybody and everybody that knew of Upchurch or around Upchurch." Id. at 153. Prior to Defendant's video, Plaintiff had sold his paintings to Defendant and another individual, Drew. Plaintiff testified that he started receiving excuses or stopped hearing from potential buyers, including Big Smo, Nima, and Jesse about buying his paintings. Id. at 141-52. After Defendant's video had been posted, Plaintiff did a painting for Loretta Lynn, Little Jug, Ryan Keith Id. at 153-55.

Yet, Plaintiff also stated that he has been doing more with his art career since the paintings he did for Defendant mainly because he is unable to work in construction as he had been doing and now puts all of his time and effort into his art as that is the only career he has. Id. at 137.

Certainly, the Court is mindful of the fine balance between First Amendment protections and that of the goal of copyright to promote the arts and sciences, which is advanced through the creation of transformative works. See generally Campbell, 510 U.S. at 579 (citation omitted).

Defendant maintains that he did not monetize nor commercialize his use of the Portraits nor sell them (Doc. 89-18). However, testimony and evidence in the form of social media posts show the paintings were auctioned for a monetary value and a significant amount of views to Defendant's social media posts concerning the Portraits. (Docs. 89-18, 89-19). Plaintiff, in contrast, maintains that Defendant's shooting of his paintings and their having been publicly auctioned and promoted on social media to Defendant's millions of followers was for purposes of self promotion and the potential to profit from the attention in his music career. (Doc. 89-19). Genuine issues of material fact, therefore, preclude the Court from making a finding as to this first factor.

2.    Nature of Copyrighted Work

This second factor "recognizes that there is a hierarchy of copyright protection in which original, creative works are afforded greater protections than derivative works or factual compilations." Katz v. Google Inc., 802 F.3d 1178, 1183 (11th Cir. 2015) (citation omitted). In considering the nature of the copyrighted work, a court evaluates "(1) whether the work was previously published and (2) whether the work is primarily creative or factual." Id.

Defendant argues that Plaintiff based his paintings on copying images from Google Image searches and therefore, the Portraits should be afforded less protection that original, creative works. (Doc. 89-18). Plaintiff, however,

- 11 -

contends that his Portraits were created independently and that Defendant has not provided support for his claim. (Doc. 89-19). Plaintiff, on the other hand, asserts that the Portraits were created independently and are both highly creative. <u>See</u> (Docs. 89-10, 89-18, 89-19). Genuine issues of material fact, therefore, preclude the Court from making a finding as to this second factor.

      3.    Significance of Original Work Copied

The third factor asks whether "the amount and substantiality of the portion used in relation to the copyrighted work as a whole" or "the quantity and value of the materials used are reasonable in relation to the purpose of the copying." <u>See</u> <u>Campbell</u>, 510 U.S. at 586 (turning attention to the persuasiveness of a parodist's justification for the particular copying done).

Defendant argues that the video posted includes the Portraits, but that the Portraits are not easily identifiable. Motion at 14; <u>see</u> (Doc. 89-18). As for the Facebook posts of the Portraits, Defendant suggests that they were reproduced in their entirety because copying any less of the image would have reduced the Portraits to being meaningless for purposes of Defendant's commentary and critique of the Parties' dispute about the Portraits. Motion at 14-15; <u>see</u> (Doc. 89-18). Plaintiff, meanwhile, posits that Defendant displayed the mutilated Portraits in their entirety and that Defendant's claim that the Portraits were used in the context of commentary of the Parties'

public dispute is unfounded because Defendant's dispute in no way involved the substantive aspects of the Portraits. (Doc. 89-19). For this reason, Plaintiff argues that Defendant's use of his Portraits was unnecessary for Defendant's stated purpose and character to weigh against a finding of fair use. (Docs. 89-19; 90). The record supports that genuine issues of material fact remain as to this factor because it is based almost entirely on the testimony of the Parties and each individual's testimony as to the meaning of their postings about the Portraits and whether the use amounted to commentary or criticism about the actual works or the conflict about the Parties' public dispute. <u>See</u> (Docs. 89-10, 89-18, 89-19, 89-20). Genuine issues of material fact, therefore, preclude the Court from making a finding as to the third factor.

### 4.   Effect of Use on Potential Market Value

The fourth fair use factor is "the effect of the use upon the potential market for or value of the copyrighted work." § 107(4). It requires courts to consider not only the extent of market harm caused by the particular actions of the alleged infringer, but also "whether unrestricted and widespread conduct of the sort engaged in by the defendant . . . would result in a substantially adverse impact on the potential market" for the original. <u>Campbell</u>, 510 U.S. at 590 (citation omitted). "[I]f the intended use is for commercial gain, that likelihood may be presumed. But if it is for a

noncommercial purpose, the likelihood must be demonstrated." Id. at 591
(citation omitted). "[W]hen a commercial use amounts to mere duplication of
the entirety of an original, it clearly supersede[s] the objects of the original
and serves as a market replacement for it, making it likely that cognizable
market harm to the original will occur." Id. (internal quotation marks and
citation omitted). "But when, on the contrary, the second use is
transformative, market substitution is at least certain, and market harm
may not be so readily inferred." Id.

The parties dispute the potential market effect of Defendant's shooting
of Plaintiff's work. See (Docs. 89-17, 89-18, 89-19). At the time he gave his
deposition, Defendant estimated he had 2.3 million subscribers on his
Upchurch YouTube channel, about 3 or 4 million followers on Facebook and
about 1.5 million followers on Instagram, and that he controls his
@ryanupchurch accounts and is the only one to post original content such as
messages and personal content on his social media platforms, unless it is an
ad for the pre-release of an album, which an assistant would post. (Doc. 89-18
at 17-18). Defendant testified that depending on what the content is that he
posts, a typical video on his Facebook has a range of 160,000 to a million
views. Id. at 20-21. A video post on Defendant's YouTube channel, that is not
a music video, for example, would have a range of 100,000 to 300,000 views
with a similar audience viewership on Defendant's Instagram account. Id. at

21. In contrast, a post of Defendant's music video may receive a hundred million views on YouTube. Id. For instance, one of his most viewed music video tracks called Rolling Stone on Defendant's YouTube channel was viewed 90 million times. Id. Defendant testified that he does not control any advertising on his YouTube channel and made $3.80 from his channel in the past four years. Id. at 21-22. Rather, Defendant receives revenue for his music through a distribution company, TuneCore. Id. at 23.

Defendant claims that Plaintiff has failed to meet his burden to support that Defendant's shooting of the Portraits and creation of the video, use of the Portraits in his social media posts or giving of the Portraits to the auction house affected the market value of the Portraits. Motion at 16; see (Doc. 89-18). Rather, Defendant argues that Plaintiff is attempting to use the Copyright Act to silence Defendant and prevent the free flow of ideas, creation, commentary, and criticism that the Act intends to preserve. Motion at 16. Plaintiff, in contrast, contends that Defendant's use of the Portraits completely supplants their market value. (Doc. 90 at 17). In particular, Plaintiff asserts that Defendant's shooting of tens to hundreds of rounds from a shotgun and automatic rifle at the Portraits with the addition of Defendant adding his signature and the words "Fuck This dudes Paintings" and "Yeah I shot this shit" supplanted the normal potential market for the Portraits. Id. Plaintiff argues that unrestricted and widespread conduct of this sort would

result in substantially adverse impact on the potential market for similar works. Id. Whether Defendant's use, considering the damage that would occur if everybody did this same act, would cause substantial economic harm so that allowing such acts would frustrate the purpose of copyright by materially impairing incentive to publish the work, is not appropriately resolved based on the record before the Court. See Cambridge, 769 F.3d at 1276.

As an example, the record supports genuine issues of material fact as to this factor. (Docs. 89-10, 89-17, 89-18, 89-19). Evidence has been presented by both parties indicative of value and consideration Plaintiff has received for his other paintings before and after the shooting and alteration of the Portraits by Defendant, and value given to the Portraits post shooting by the auction house and winners of the auction. (Docs. 89-18, 89-19). This factor is further complicated in that Plaintiff claims to have made the Portraits specifically for Defendant, one of which is of Defendant, with the expectation of payment by Defendant. (Docs. 89-10, 89-17, 89-18, 89-19). The record also reflects that Defendant's sizeable social media following, posting of the video and Portraits post shooting and signing them with the addition of the phrases did have a value of some level for his fans through the auction. (Docs. 89-10, 89-17, 89-18, 89-19). Defendant's testimony that Plaintiff has not presented evidence to support that Plaintiff intended to market or license the Portraits

does not support, at this stage and given the facts in dispute, a failure to demonstrate the existence of market harm caused by Defendant's actions. See (Docs. 89-10, 89-17, 89-18, 89-19).

Because of the disputed material facts at issue as to this factor, the Court is unable to determine as a matter of law whether Defendant's use of the Portraits constituted copyright infringement. Accordingly, the Court will deny summary judgment as to Count Four of the Consolidated Complaint.

### b.     VARA Right of Integrity

The Visual Artists Rights Act prohibits the modification of an artist's work that is harmful to that artist's reputation. See Castillo v. G&M Realty L.P., 950 F.3d 155, 163-64 (2d Cir. 2020) (citing 17 U.S.C. § 106A(a)(3)(A)). In addition, VARA prohibits the destruction of a work that has achieved a recognized stature, even after the work is sold. Id. (citing § 106A(a)(3)(B)). More specifically, VARA provides that:

> the author of a work of visual art . . . shall have the right—
>
> (A) to prevent any intentional distortion, mutilation, or other modification of that work which would be prejudicial to his or her honor or reputation, and any intentional distortion, mutilation, or modification of that work is a violation of that right, and
>
> (B) to prevent any destruction of a work of recognized stature, and any intentional or grossly negligent destruction of that work is a violation of that right.

17 U.S.C. § 106A(a)(3)(A),(B). A painting is defined as a work of visual art by the Copyright Act. See 17 U.S.C. § 101.

"[T]he right of attribution protects the author's right to be identified as the author of his work and also protects against the use of his name in connection with works created by others." Museum of Contemporary Art Found., Inc. v. Buchel, 593 F.3d 38, 48 (1st Cir. 2010) (citations omitted). "The right of integrity allows the author to prevent any deforming or mutilating changes to his work." Id. (internal quotation marks omitted). Although these moral rights "exist independent[ly] of the economic rights" granted to all authors under the Copyright Act . . . they are part of the same statutory framework." Id. (citing 5 William F. Patry, Patry on Copyright § 16:1 (2009)).

"We think this a useful approach, but emphasize that the focus is on the artist's reputation in relation to the altered work of art; the artist need not have public stature beyond the context of the creation at issue." Buchel, 593 F.3d at 48 (citing H.R. Rep. No. 101–514, at 5 (1990) ("House Report"), as reprinted in 1990 U.S.C.C.A.N. 6915, 6917 House Report at 15, as reprinted in 1990 U.S.C.C.A.N. at 6925 ("[A]n author need not prove a pre-existing standing in the artistic community.")).

In a prior order on a motion to dismiss the First Amended Complaint, the Court determined that Plaintiff had no burden to allege that the Works

were of recognized stature because Plaintiff brought his claim under section

106A(a)(3)(A) and not section 106A(a)(3)(B). See (Doc. 32 at 5-6). In the

subsequent Consolidated Complaint, Plaintiff brings this action under 17

U.S.C. § 106A, without specific reference to a subsection. (Doc. 49). In Count

One of the Consolidated Complaint, Plaintiff has expanded the allegations

regarding the claimed violations under VARA. Id.  In particular, the claims

regard his right, as the author of the Works, "to prevent any intentional

distortion, mutilation, or other modification of the Cash Portrait and the

Upchurch Portrait that would be prejudicial to his honor or reputation." Id. at

13-14. While Plaintiff does make claims concerning the mutilation of the

Works, absent from the Consolidated Complaint are any allegations about

the destruction of the Works for section 106A(a)(3)(B) to be applicable. Id.

The Court previously ruled that:

> Plaintiff has sufficiently alleged prejudice to his honor or
> reputation in the Amended Complaint. VARA does not
> explicitly define the terms prejudicial, honor, or
> reputation. Massachusetts Museum of Contemporary Art
> Foundation, Inc. v. Buchel, 593 F.3d 38, 54 (1st Cir. 2010)
> . However, Congress has noted that the prejudice inquiry
> should "examine the way in which a work has been
> modified and the professional reputation of the author of
> the    work." Id. (citing H.R.    REP. 101-514,    1990
> U.S.C.C.A.N. 6915, 6925-26 (footnotes omitted)). Similarly,
> the   court   in Carter   v.   Helmsley-Spear,   Inc. applied
> dictionary definitions of prejudice, honor, and reputation to
> conclude   it   should "consider   whether   [the   proposed]
> alteration would cause injury or damage to plaintiffs' good
> name,   public   esteem,   or   reputation   in   the   artistic
> community." 861 F. Supp. 303, 323 (S.D.N.Y. 1994), aff'd in

part, vacated in part, and rev'd in part, 71 F.3d 77, 83 (2d
Cir. 1995). In Buchel, the First Circuit applied these
standards and found an artist's claim for prejudice to his
honor or reputation survived summary judgment when a
museum altered a work without the author's consent,
displayed it, and received negative reactions to
it. 593 F.3d at 59-61.

In this case, Plaintiff alleges Defendant altered or
modified the Works by shooting, signing, and writing
derogatory remarks on them. (Doc. 12 at ¶ 38). Defendant
widely distributed images of the altered works on social
media and had them publicly displayed at an
auction. Id. at ¶¶ 39-41. Plaintiff claims this conduct has
caused him irreparable harm. Id. at ¶¶ 42-43. Though the
allegations of damage are conclusory, it can be reasonably
inferred from the facts alleged that Plaintiff's reputation
would be harmed by Defendant's alterations to the Works.
Defendant's actions could reasonably lead to the Works
and, by extension, Plaintiff's name and reputation in the
artistic community being mocked and ridiculed. Plaintiff is
entitled to the benefit of such inferences at this stage of the
case. Iqbal, 556 U.S. at 678.

Defendant's testimony that in shooting the portraits he was attempting
to create his own art, and that he signed the portrait with his signature
taken together with his testimony about initially giving the portraits to be
auctioned, could be taken as presenting the portraits as his own for purposes
of the auction. (Doc. 89-18). Ultimately, Plaintiff's reputation in relation to
the altered Portraits cannot be resolved on summary judgment. Because
genuine issues of material fact remain in dispute, summary judgment is
inappropriate as to this issue.

c.    Conversion and Trespass to Chattels

In Count Two, Plaintiff brings a claim against Defendant for conversion and alleges that Defendant acknowledged Plaintiff's ownership rights in the Portraits but has refused to pay or return the Portraits to Plaintiff despite his demands and has therefore deprived Plaintiff of his property. (Doc. 49 at 14). In his trespass to chattels count, Plaintiff also alleges that Defendant's conduct in mutilating the Portraits impaired their condition, quality, and value, and was without Plaintiff's consent. Id. at 15.

Florida law, which applies, here, defines conversion as an "unauthorized act which deprives another of his property permanently or for an indefinite time." Senfeld v. Bank of Nova Scotia Trust Co. (Cayman), Ltd., 450 So. 2d 1157, 1160-61 (Fla. 3d DCA 1984) (citations omitted). "A conversion may occur where a person wrongfully refuses to relinquish property to which another has the right of possession." Seymour v. Adams, 638 So. 2d 1044, 1047 (Fla. 5th DCA 1994) (citation omitted); see Goodrich v. Malowney, 157 So. 2d 829, 832 (Fla. 2d DCA 1963) ("The purpose of proving a demand for property by a plaintiff and a refusal by a defendant to return it in an action for conversion is to show the conversion. The generally accepted rule is that demand and refusal are unnecessary where the act complained of amounts to a conversion regardless of whether a demand is made.").

For a trespass to chattels claim, a plaintiff must show intentional use or interference with a chattel in another's possession without justification. See Coddington v. Staab, 716 So. 2d 850, 851 (Fla. 4th DCA 1998) (citation omitted). A finding of intent to make a gift under Florida law requires the following be shown: (1) donative intent, (2) delivery or possession of the gift, and (3) surrender of dominion and control of the gift." Mills v. Mills, 845 So. 2d 230, 233 (Fla. 3d DCA 2003) (citation omitted).

Defendant moves for summary judgment as to Plaintiff's Conversion and Trespass to Chattels counts arguing that Plaintiff cannot establish that Plaintiff has any right to the Portraits nor a right to possession of the Portraits. (Doc. 89 at 29). In support, Defendant argues that Plaintiff voluntarily delivered possession of the Portraits to his booking manager at the time, Chad Sheppard, and requested Mr. Sheppard give the Portraits to Defendant. Mr. Sheppard testified that he told Plaintiff that no money would be exchanged for the paintings, Plaintiff was insistent on him taking the paintings to Defendant, and Mr. Sheppard took the paintings to Defendant's tour bus. (Docs. 89-20 at 14, 20-27, 30, 32-33; 89-21 at 10-11).

Mr. Sheppard and Mr. Luce further testified that Defendant constantly receives gifts from fans and that everyone who shows up at a meet-and-greet has something for Defendant. (Doc. 89-20 at 25-26, 28, 38, 47; 89-21 at 29). Defendant was not expecting portraits to be delivered to him, and Plaintiff

did not communicate to Mr. Sheppard that Plaintiff expected payment for the paintings from Defendant. (Doc. 89-20 at 25-26, 28, 38, 47). Rather, Mr. Sheppard testified that he told Plaintiff he was not getting paid for the paintings. Id. at 38. In addition, Defendant points to the text messages between Plaintiff and Brandon Luce, Defendant's manager and videographer. (Doc. 89-21 at 8). Mr. Luce testified that Defendant does his own YouTube videos and vlogs and that Defendant also handles all of his social media, including Instagram and Facebook (Doc. 89-21 at 9, 14). According to Mr. Luce, he remembers Defendant asked Mr. Luce to give Plaintiff the profits from the merchandise sales for two paintings in 2018, which was a couple of hundred dollars (Doc. 89-21 at 11, 16-17).

As for the two paintings at issue in this action, Mr. Luce stated that he remembered seeing the two paintings at issue on the tour bus. Id. at 18-20. Mr. Luce testified that Mr. Sheppard told him that Plaintiff gave Mr. Sheppard the paintings at Mr. Sheppard's hotel and Mr. Sheppard then placed the paintings on the tour bus without an exchange of money with Plaintiff. Id. at 18-20. Mr. Luce testified that on October 26, 2018, the night the paintings were placed on the tour bus, he told Plaintiff through Instagram messaging that security was strict about not allowing large objects into the building and that they could not accept the paintings at the concert venue. Id. at 20-23. Mr. Luce further testified that he told Plaintiff they could

not give him any money for any painting and that Mr. Sheppard told him specifically that there was no money exchanged and that Plaintiff told Mr. Sheppard he was not expecting money for the paintings. Id.

Plaintiff maintains the Portraits were delivered with the intent that he would receive payment for them from Defendant (Doc. 89-19 at 71-127). More specifically, Plaintiff testified that as an artist, he has created approximately fifty works since 2017 and has sold about ten of his paintings from $200 to $1000 per painting. (Doc. 89-19 at 15-16).  Plaintiff also testified that he has given away some paintings as gifts to close friends. Id. at 17-18. However, Plaintiff also testified that if he meant for a painting to be a gift he would tell the recipient it was a gift. Id. Because material facts are at issue, summary judgment at this stage is inappropriate and Defendant's motion is due to be denied as to the conversion and trespass to chattels claims.

**2.    Plaintiff's Motion**

In Plaintiff's Motion for Summary Judgment, he argues for summary judgment in his favor as to Defendant's Counterclaim for defamation based on Defendant's alleged failure to allege malice and harm and lack of evidence to support that the social media posts impacted him as a professional musician (Doc. 84 at 16-18; Motion).  Rather, Plaintiff asserts that Defendant's profession is being an inflammatory media personality and that any claim of harm is implausible. Motion at 18. Plaintiff further contends

that his statements about the works are statements of his belief and opinion based on the facts disclosed in the record and that Defendant has failed to create a genuine issue of fact as to his belief and opinion. Id. at 18.

In response, Defendant contends that genuine disputes exist over facts of the case to preclude summary judgment (Doc. 91 at 5).  First, Defendant disputes that he requested Plaintiff paint of portrait of him for a fee. Id. Second, Defendant disputes that the parties discussed Plaintiff's creation of future portraits for Defendant or any specific rate for the creation of future portraits for Defendant. Id.

Under Florida law, which governs this action, defamation consists of the following elements: "(1) publication; (2) falsity; (3) the statement was made with knowledge or reckless disregard as to the falsity on a matter concerning a public official, or at least negligently on a matter concerning a private person; (4) actual damages; and (5) the statement must be defamatory." Turner v. Wells, 879 F.3d 1254, 1262 (11th Cir. 2018). "Because of the expressive freedom guaranteed by the First Amendment, a defendant may not be held liable for defaming a public figure about a matter of public concern unless he is shown to have acted with actual malice." Berisha v. Lawson, 973 F.3d 1304, 1310 (11th Cir. 2020) (internal quotation marks and citation omitted).

The Court previously concluded that Defendant is a public figure, that Defendant did not contest this, and that Defendant's counterclaim sufficiently alleged malice. (Doc. 77 at 5-6). In his counterclaim, Defendant alleges defamation and libel per se against Plaintiff for posting allegedly false statements on Defendant's Instagram account and Plaintiff's personal Instagram account to followers. (Doc. 50 at 12-17). Defendant claims that Plaintiff posted the statements intentionally and with malice, having knowledge of the falsity of the statements and with callous disregard of Defendant's rights. (Doc. 50 at 12-17).

Plaintiff, through his Instagram account at @thepainterdude, published the following statements on Defendant's Instagram account, @ryanupchurch, November 7, 2017: "Ryan Upchurch So you dont wanna talk to me man to man after you commissioned a painting from me not wanting to pay for it, with you knowing what my paintings go for and of your ownself on a massive canvas." (Doc. 50-1). The other statement at issue is alleged to have been posted by Plaintiff on Plaintiff's personal Instagram, @thepainterdude, November 9, 2018: "He ordered this portrait and I gave him the Johnny Cash as a gift. And yet he cant be a man of his word and pay for a commissioned portrait . . ." (Doc. 50-2).

Defendant alleges that the above statements posted by Plaintiff caused injury to him because they accuse him of committing theft and have caused

him injury in his professional reputation as a music performer and entertainer (Doc. 50 at 16). As a direct and proximate result of Plaintiff's statements, Defendant claims he has suffered and continues to suffer severe and irreparable harm and substantial damages and requests compensatory, exemplary, and punitive damages. (Doc. 50 at 17). While Defendant acknowledges that he did request a portrait of Hank Williams, Sr. and Kane Brown from Plaintiff in 2017, Defendant testified that at no time after 2017 did he request nor commission artwork from Plaintiff nor agree to pay any amount of money to Plaintiff for the portraits. (Doc. 89-18 at 26-103).

"Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "When determining if a genuine factual issue as to actual malice exists in a libel suit brought by a public figure, a trial judge must bear in mind the actual quantum and quality of proof necessary to support liability under New York Times[2]." Id. at 254. Thus, the appropriate consideration for a court determining summary judgment where a factual dispute concerns actual malice is "whether the evidence in the record would permit a reasonable jury finding either that the plaintiff has shown actual malice by clear and

---

[2] New York Times Co. v. Sullivan, 376 U.S. 254 (1964).

convincing evidence or that the plaintiff has not." Id. at 255-56. However,

"[c]redibility determinations, the weighing of evidence, and the drawing of

legitimate inferences from the facts are jury functions, not those of a judge."

Id. at 255.

Here, Plaintiff presents evidence that his statements are true. (Doc. 89-19). Defendant has also presented evidence that Plaintiff's public accusations that Defendant "commissioned a painting . . . not wanting to pay for it" and that Defendant "can't be a man of his word and pay for a commissioned portrait" caused injury in his professional reputation as a music performer and entertainer as his profession depends on his ability to collaborate with other musicians, entertainers, artists and creators. (Docs. 50-2; 89-18).

In his deposition, Plaintiff recounts the history between the parties, which he testified began in 2016 with their meeting at a concert in Jacksonville, Defendant's request for Plaintiff's paintings, delivery of the paintings to Defendant and payment to Plaintiff for the paintings (Doc. 91-2 at 40-59). As for the works at issue, Plaintiff was questioned about the five paintings he did for Defendant: the selfie of Plaintiff and Defendant, Hank Sr., Kane Brown, Johnny Cash, and of Defendant himself. (Doc. 91-2 at 59). Plaintiff testified that Defendant

> was wanting a Johnny Cash painting throughout just
> the random conversations. Was never planning to
> paint it, but then I just randomly wanted to paint it

>for myself. Then later on he was buying—he wanted
>his portrait and I thought that was going to go good
>as a buy-one-get-one-free deal since he's bought from
>me before.

Id. at 60. Overall, Plaintiff's testimony about the relationship between the two as regards the paintings and delivery and payment was open ended in that Defendant wanted him to do more but was not specific. Plaintiff testified that Defendant asked how hard it would be for him to paint a head shot and Plaintiff took that as an order because that is the way it usually happened between the two. (Doc. 91-2 at 69).

As for payment, Plaintiff testified that he had a conversation with Defendant about the prices of Plaintiff's paintings in January of 2018 when Plaintiff believes Defendant ordered the head shot painting and that Defendant said he would pay Plaintiff without specifically saying he would pay a thousand dollars or any amount for the head shot painting. Id. at 70-71. Plaintiff testified that it was not a gift. Id. According to Plaintiff, he and Defendant's relationship was "always about business and the paintings and money." Id. at 82. Plaintiff expected payment for the portrait of Defendant but testified that the Johnny Cash portrait would be free. Id. at 85-86. Plaintiff further testified that he got the works at issue to Defendant in October of 2018, and that the portrait of Defendant was never meant to be a gift but that it was a business deal; however, Defendant decided to claim it

was a gift after he made his video about the situation. Id. at 86-88. Plaintiff testified that he was asked to deliver the works to Defendant in Fort Myers, which he did. Id. at 90. Plaintiff testified that he gave the works to Defendant's booking agent, who told Plaintiff he would help him out and "never made it seem like [Plaintiff] forced it on him either." Id. at 90.

Defendant, as support, provides the deposition of Chad Sheppard, who was Defendant's manager at the time Plaintiff left the Portraits after the show. (Doc. 89-20). Mr. Sheppard testified that when Plaintiff handed him the Portraits, he clarified with Plaintiff that Plaintiff was giving the Portraits to Defendant and that there was not an exchange of money. (Doc. 89-20 at 25). Defendant has also testified that the Portraits were gifts. (Doc. 89-18).

For purposes of a libel per se determination, the Court previously determined that the statement does not accuse Defendant of an "infamous crime." (Doc. 77 at 7). In addition, the Court concluded in a prior order that "Plaintiff's statements indicate[] he was making factual claims related to his business dealings with Defendant. As such, Plaintiff is not immune from Defendant's defamation claim on the basis that his statements were pure opinions." (Doc. 77 at 10.) Indeed, the Court has considered that

> Plaintiffs statements about Defendant arguably call into question Defendant's honesty and trustworthiness, characteristics which are necessary for virtually any person to engage in his or her profession. Defendant even alleges that his reputation

> is critical in finding other musicians to collaborate with him professionally. (Doc. 50 at 16). Since Plaintiff's statements are capable of a defamatory meaning, whether the statements actually impugned Defendant's trade or profession is reserved for the jury.

(Doc. 77 at 8).

As for Defendant's relationship with Plaintiff, Defendant describes him as a "[g]uy at a show that had a painting that I wanted to be nice to." Id. at 25. Defendant does not recall the exact date he first met Defendant because he meets so many people after his shows. Id. at 24-26. Defendant testified that he remembers that Plaintiff, in probably 2017 or 2018, approached Defendant after Defendant's show and tried to sell a painting to another rapper. Id. Defendant stated that this other rapper at the show did not want the paintings, and Defendant "kind of felt bad so I bought his paintings and I gave him like all of the money I had made from the show and kept like gas money for myself. And I bought a painting from him." Id. at 25-26. !

Throughout their history, the parties have not had formal written agreements, but rather, communicated or interacted through social media posts. See, e.g., id. at 31. Defendant testified that he requested the Hank Williams painting but not the Kane Brown work. Id. at 26, 34. What remains at issue here is the truth or falsity of the alleged defamatory statements so that a material fact is at issue to preclude disposition of this issue. Thus,

summary judgment is inappropriate as to Defendant's counterclaim and Plaintiff's motion is due to be denied.

Upon consideration, it is

**ORDERED**:

1.      Plaintiff Jacob Aaron LeVeille's Motion for Summary Judgment of Defendant Ryan Edward Upchurch PKA Upchurch's Consolidated Counterclaim (Doc. 84) is **DENIED**; and

2.      Defendant's Amended Motion for Summary Judgment of Plaintiff's Consolidated Complaint (Doc. 89) is **DENIED**.

**DONE AND ORDERED** at Jacksonville, Florida, this  ___*15th*___ day of October, 2021.

BRIAN J. DAVIS
United States District Judge

7
Copies to:
Counsel of Record